IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:12-cr-00081-AA |
| | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MICHAEL LEE FRY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

AIKEN, Chief Judge:

Defendant Michael Lee Fry is charged with felon in possession
of a firearm.  Defendant moves to suppress all evidence obtained as
a result of traffic stop occurring on November 13, 2011.

BACKGROUND

On Sunday, November 13, 2011, at approximately 9:27 p.m.,
Sutherlin, Oregon Police Officer Erik Johnson stopped a Dodge
Stratus.  Although there is considerable dispute as to the timing

of the events occurring at the subject traffic stop, the court finds that the evidence supports the following.[1]

At about 9:20 p.m., Officer Johnson observed, from his marked patrol car, the Dodge Stratus in the parking lot of Vera's Tavern in Sutherlin.   The Stratus's driver side door was open and its lights were on.   Johnson then observed the male driver exit the car and walk to the tavern.   Officer Johnson's experience has taught him that intoxicated individuals sometimes decide not to drive away from a bar after they observe a patrol car.

Officer Johnson drove over to the Stratus and observed that it had been driven over the concrete parking stop to a point where it was touching a transmission shop adjacent to the tavern.   Officer Johnson further observed that the driver's side window was open, which he thought was unusual given the temperature of about 40 degrees.

Believing the driver may be intoxicated, Officer Johnson drove to a nearby parking lot to observe the Stratus without being readily detected.   Within minutes, Officer Johnson noticed the male leaving the tavern accompanied by a female walking away from the vehicle.   As they left the tavern, the male took off his sweatshirt and handed it to the female.

---

[1]The court acknowledges that there are inconsistencies in the two police reports prepared by Officer Johnson, and that the testimony also deviated from the written documents.

While Officer Johnson did not observe the male and female enter the vehicle, he did, within a short time, notice the Stratus's brake lights come on. The driver had to back up quickly and rev the engine to back over the parking stop.

Officer Johnson observed the Stratus pull onto West Everett Avenue and then turn left on South Calapooia Street. Because Officer Johnson believed the driver may be intoxicated, he followed the vehicle. The Stratus made a sharp turn onto Strong Avenue without signaling. Officer Johnson believes the driver saw him and made the turn onto, what turned out to be, a dead-end street to avoid him.

Failure to signal a turn is a violation of O.R.S. § 811.335. Accordingly, Officer Johnson activated his lights and stopped the Stratus at about 9:27 p.m.

Officer Johnson asserts that because the driver continued when the lights were activated before pulling over next to a house,[2] he believed that the driver was attempting to flee when both front doors opened. The female passenger did get out and Johnson quickly exited his patrol car and observed the male driver, who was heavily tattooed and wearing a tank top. The male driver also exited the Stratus and stared at Officer Johnson. Based on the male's body language, Johnson believed that the male was trying to decide whether to run or fight.

_____

[2]The actual distance traveled must have been short because Strong Avenue is only about 125 feet long.

3 - ORDER

The female passenger began to run, but stopped at a fence. Officer Johnson told her to stop, but she turned and went past his patrol car and behind Johnson. In order to keep the male driver in view, Officer Johnson did not pursue the female beyond the rear bumper of his patrol car. The female continued on while yelling, "I don't even know him, I don't want to be part of any of this!"

While the female continued away, the male remained near the driver side door of the Stratus. Officer Johnson asked the male for a driver's license, which the male did not have. Johnson asked for identification and the male stated he did not have any. At this point, officer Johnson handcuffed and detained the male.

Under O.R.S. § 807.570(1), a person commits the offense of failure to carry or present a license if he drives without a license in his possession or does not present one when requested by a police officer upon being lawfully stopped. Accordingly, Officer Johnson asserts that he handcuffed and detained the male for violation of O.R.S. § 807.570. Under this statute,

> A police officer may detain a person arrested or cited for the offense described in this section only for such time as reasonably necessary to investigate and verify the person's identity.

O.R.S. § 807.570(4).

Officer Johnson placed the male in the patrol car and radioed for backup to assist with locating the female. At this time, Johnson scanned the males clothing for bulges that may indicate the presence of gun, but did not see any.

4 - ORDER

Johnson walked to Calapooia Street to look for the female. When backup officers Joe Felix and Paul Sliva arrived, they looked for the female. Johnson returned to the patrol car and read the male his Miranda rights.

Officer Johnson ascertained that the male's name is Michael Fry and then asked for the name of the female. Defendant Fry said he did not know her, and that he picked her up at the bar. Officer Johnson asserts that he recognized Fry's name from an incident he had heard about in which Fry had attempted to assault officers with a wrist rocket using ball bearings.[3] Johnson also asserts that he heard that Fry is methamphetamine user. Moreover, Johnson asserts that a former corrections deputy told him that Fry was a bad motherfucker when in jail.[4] Accordingly, Johnson asserts that he removed defendant Fry from the patrol car when the backup officers returned, without the female, and conducted a pat down for weapons for officer safety.

Officer Johnson states that he felt bulges in Fry's pockets that felt like knifes and removed a small flashlight and a roll of tape from one pocket, and a folding pocket knife from another. Officer Johnson observed crystals reflecting light off the knife

---

[3]This particular incident occurred in 1994. Johnson heard about it from another officer a few months previous to the stop, but he was not aware of when the incident occurred.

[4]This conversation also occurred few months previous to the stop and Johnson was aware that the time frame for the observation of Fry was at least a couple years prior.

when he shined his flashlight on it.  Johnson asserts that in his experience, such crystals were methamphetamine.  Johnson placed the aside and later seized it as evidence, placing it in its own bag. Officer Johnson did not seize the cell phone Fry had with him.

Johnson asserts that during his contact with Fry, he observed Fry sweating profusely despite the fact he was wearing a tank top in 40-degree weather.  He also observed Fry speaking rapidly and being unable to stand still.  Further, Johnson observed that Fry's pupils were large even with light in his eyes.  Officer Johnson asserts that, based on his experience, such observations demonstrate that Fry was more likely than not, under the influence of methamphetamine.

Officer Johnson ran a check on Fry and the vehicle and learned that Fry's license was suspended.  Additionally, Johnson learned that Fry was on felony post-prison supervision for burglary.  Fry then told Johnson that the Stratus belonged to a male friend from whom he was buying.  But Johnson discovered that the Stratus was registered to a female.  Officer Johnson also noticed that one of the Stratus's windows had been removed and was in the back of the car.  Based on this, Johnson suspected that the vehicle had been stolen.

At about 9:40 p.m., officer Johnson decided to call Fry's supervising probation officer, but she was not available.

Officer Johnson also conducted a field sobriety test and Johnson concluded that Fry was not significantly impaired, but did observe indicators of methamphetamine influence, including a fresh injection mark on Fry's left arm.[5]

Johnson did speak with Fry's probation officer's colleague, Officer Baker. Johnson informed Baker of the situation, including his suspicion that Fry was under the influence of methamphetamine and that Fry had a knife with what appeared to be methamphetamine residue. Officer Baker told Johnson that Fry had a recent dirty urine analysis[6] for methamphetamine and requested that Johnson detain Fry for violation of his supervision.

Officer Baker also requested that Johnson ask Fry for consent to search the vehicle, which Fry refused. Officer Baker asked that the refusal be added as a violation of Fry's supervision.[7] Officer

---

[5]Johnson is a former EMT familiar with the appearance of injection marks.

[6]It is not clear what Baker said, but Fry's most recent methamphetamine use, according to his probation file, occurred approximately two and a half months before the traffic stop. At that time, Fry did not test positive, but rather he made an admission of use.

[7]The parties have referred to Fry as being on probation. If this is the case, Under O.R.S. § 137.540(1)(I), a court may impose, as a condition of probation, a requirement that the probationer consent to search of his vehicle upon the request of a representative of a supervising officer, if the supervising officer has reasonable grounds to believe evidence of a violation will be found. Regardless of whether the supervising officer must be present to ask for consent, another condition requires that Fry obey all laws. O.R.S. § 137.540(1)(j). However, it appears that Fry was actually subject to post-prison supervision, in which case O.R.S. § 144.102(2)(f) also requires Fry to obey all laws. The court has not been provided with the actual conditions to which Fry was subject.

Johnson then arrested Fry for violation of his post-prison supervision and placed him back in the patrol car.

Officer Johnson then determined, based on his experience and the circumstances, he had probable cause to believe that the knife contained methamphetamine. Officer Johnson then opened the knife and saw more crystals. Johnson swabbed the knife blade and conducted a field test for methamphetamine. The test returned positive.

Johnson also ran Fry's name and discovered Fry's history of arrests involving methamphetamine. Based on this and the other circumstances, Officer Johnson concluded that the Stratus, more likely then not, contained methamphetamine and items associated with its use and possession. Johnson also observed, from outside the vehicle, a ski mask or hat and gloves which he concluded may be used for burglaries. Accordingly, Johnson and Sutherlin Police Sergeant Felix began searching the Stratus for drugs. After seizing the ski mask and gloves, Johnson found a backpack and saw the barrel of a handgun. The backpack contained a Charter Arms .22 caliber pistol with a spare barrel as well as letters, photos and documents associated with Fry. Other items found included Fry's wallet with an expired identification card.

Because there appeared to be no insurance associated with the Stratus, and officers were unable to locate the owner, officers called a tow truck. The officers also lodged Fry in the Douglas

County jail on charges of felon in possession, unlawful possession of methamphetamine and violation of the terms of his post-prison supervision.

DISCUSSION

Defendant raises the following bases in seeking suppression of evidence obtained during the traffic stop:

> (1) the officer lacked reasonable cause to stop the vehicle; (2) having stopped the vehicle, the officer unduly prolonged the stop by converting it from a traffic stop investigation into an investigation of other suspicions; (3) the officer conducted an illegal pat-down search of Mr. Fry, meaning that all of the officer's further actions on the basis of evidence obtained during that pat-down (a folding knife with apparent residue) were the illegal fruits of that pat-down; (4) the officer also illegally opened the folding knife, which he lacked probable cause to do, meaning that any further police action based on that knife is tainted; (5) whether or not the officer had probable cause to believe that Mr. Fry was under the influence or in possession of methamphetamine, the officer lacked probable cause to search the vehicle; and (6) in the absence of probable cause, there was no other legal basis for searching the car or its contents.

## 1-2. The Vehicle Stop and Its Duration

Defendant argues that Officer Johnson did not have sufficient reasonable suspicion to stop the Stratus. However, the failure to signal the turn onto Strong Avenue is a violation of O.R.S. § 811.335. The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. Delaware v. Prouse, 440 U.S. 648, 653 (1979).

Defendant also contends that the length of the stop was unreasonable because it was not processed as a traffic violation, but continued to investigate unrelated matters that unreasonably prolonged the stop in violation of the Fourth Amendment. But here, the fluid nature of the stop and compiling violations, themselves supported by reasonable suspicion, necessitated the length of the stop.

Not only did the officer have reason to stop the Stratus for failure to signal a turn, but Officer Johnson's observations provided a reasonable suspicion that the driver was driving under the influence. The manner in which the car was parked and the fact that the driver apparently exited the car after noting the presence of a patrol car, suggest intoxication in light of the location at a bar. The fact that the driver took a circuitous route back to the car and apparently attempted to "lose" the officer once spotted also raises suspicion. Nonetheless, the total distance driven was very short and other than the unsignaled turn, no further observations of impaired driving behavior were observed. But even assuming that Officer Johnson lacked reasonable suspicion[8] of DUII

---

[8]Reasonable suspicion determinations look at the "totality of the circumstances" of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. See, e.g., United States v. Cortez, 449 U.S. 411, 417-18 (1981). This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. Id. at 418. Although an officer's reliance on a mere hunch is insufficient to justify a stop under Terry and its progeny, the likelihood of criminal
(continued...)

10 - ORDER

at beginning of the stop, he certainly could ask for identification after lawfully stopping the driver for failure to signal the turn. While it is true that police questioning unrelated to the reason for the stop may not unreasonably prolong the stop, <u>Muehler v. Mena</u>, 544 U.S. 101 (2005), the events during the stop provided further reasonable justification for detention.

The initial stop itself justified the request for a driver's license and the failure to produce that license then justified detention until the driver's identity could be ascertained. Moreover, the actions of the passenger also extended the time to investigate, as did the actions of the driver in getting out of the car.

The circumstances that evolved from the attempts to ascertain Defendant Fry's identification in a dynamic situation that also involved a search for the passenger, gave further rise to suspicion of risk to officer safety. This in turn gave raise to reasonable suspicion of methamphetamine possession and violation of the conditions of post-prison supervision. Assuming the constitutionality of the pat down, these events also provided probable cause to search the car for contraband. This all occurred in a time frame of about 32 minutes from stop to arrest for

---

[8](...continued)
activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, <u>United States v. Sokolow</u>, 490 U.S. 1 (1989).

11 - ORDER

violation of post-prison supervision. This is not unreasonably long under the totality of the circumstances.

## 3. The Pat Down

Although Officer Johnson's stop of the Stratus was constitutional, unless Officer Johnson can point to specific facts that demonstrate reasonable suspicion that Fry is armed and dangerous, the Fourth Amendment tolerates no frisk. Knowles v. Iowa, 525 U.S. 113, 117-119 (1998).

While attempting to ascertain defendant Fry's identification, Officer Johnson learned the following: (1) the passenger fled the scene stating she did not want to be a part of this; (2) the male driver was muscular and appeared to be weighing an option to flee or fight; (3) Fry's name has been associated with a violent methamphetamine user who previously used weapons against police; and (4) Fry exhibited behavior consistent with being under the influence of methamphetamine. These are specific facts demonstrating a reasonable suspicion that Fry was dangerous. Although it does not appear that Johnson observed bulges in Fry's pocket consistent with knives before patting him down, it appears reasonable, under the circumstances, to suspect Fry to have been armed.[9]

---

[9]Of course the mere suspicion of drug use alone does not equate to suspicion of a person being armed. See, e.g., Ramirez v. City of Buena Park, 560 F.3d 1012, 1022 (9th Cir. 2009). However, the (continued...)

## 4. Opening the Knife

The field test for methamphetamine was conducted on crystals from the blade that was folded into the pocket knife.

Defense counsel states that Officer Johnson's supplemental report indicates that Johnson

> view[ed] the folded knife as a closed container and [did] not open it without probable cause to so. The crystalline substances I viewed were on the handle portions of the knife near the end where the blade would fold from.

After the field sobriety test and after the arrest for post-prison supervision, Officer Johnson opened the knife. Then Johnson observed more crystalline substances and tested a small amount. The government argues that a search incident to arrest and plain view justify the search.

The government claims the *defacto* arrest for failure to present a license justifies the search of the knife. Defendant argues no such arrest took place and likely would not have given the pettiness of the offense. However, the statute at issue contemplates detention of a person "arrested ... for the offense ... for such a time as reasonably necessary to investigate and verify the person's identity." O.R.S. § 807.570(4). That exactly what Officer Johnson did when he handcuffed Fry and undertook to identify him and corroborate his identity with his probation

---

[9](...continued)
nature of the suspected crime does factor in the determination.

13 - ORDER

officer.  Indeed, it was at about this time that Johnson read Fry his <u>Miranda</u> rights.  Because defendant's identity had been established by the time there was probable cause to believe he had also violated his terms of his supervised release, of course the report would not indicate Fry was taken into custody and arrested for the failure to present.

A search incident to arrest justifies searching the contents of items found on the Fry's person.  <u>See</u> <u>United States v. Passaro</u>, 624 F.3d 938, 944 (9th Cir. 1980) (the legal arrest of a person permits, for at least a reasonable time and to a reasonable extent, police to search for weapons, means of escape, and evidence). Accordingly, an inspection of the contents of items found on Fry is a permissible search incident to arrest.  <u>See</u>, <u>id.</u> (permitting search of the defendant's person, including the contents of his wallet to discover evidence of crime).  In addition, the delay in the opening of the knife does not negate the reasonableness of the search.  <u>See,</u> <u>id.</u> (search is lawful even if a substantial period of time has elapsed).

Even if the search incident to arrest exception to the warrant clause does not justify opening the knife, the discovery of the knife following lawful pat down and the plain view of the crystals make opening the knife a de minimus further intrusion.  Moreover, the crystals, combined with the observations that indicated Fry was under the influence of methamphetamine, would justify an arrest for

possession of methamphetamine and the search of the knife would be
justified as a search incident to that arrest.

## 5-6. Vehicle Search

The government argues that the warrantless search of the car
is justified because there was probable cause to believe it
contained contraband. Moreover, the search of the contents of the
backpack are similarly justified under the automobile exception.
See  United States v. Acevedo, 500 U.S. 565, 579-80 (1982) (The
scope of a warrantless search of an automobile is not defined by
the nature of the container in which the contraband is secreted.
Rather, it is defined by the object of the search and the places in
which there is probable cause to believe that it may be found).

Probable cause is a flexible, common-sense standard.  It
merely requires that the facts available to the officer would lead
a man of reasonable caution to believe that certain items may be
contraband or stolen property or useful as evidence of a crime; it
does not demand any showing that such a belief be correct or more
likely true than false.  Texas v. Brown, 460 U.S. 730, 742 (1983).
A determination of probable cause depends on the totality of the
circumstances.  Illinois v Gates, 462 U.S. 213, 238 (1983).

Given defendant's behavior, the plain view of the crystals on
the knife handle, the information provided by Baker, the female
passenger fleeing, defendant's history of drug offenses, and

15 - ORDER

Officer Johnson's experience, probable cause to search the car for drugs existed even absent the testing of the knife. The positive test does serve to buttress Officer Johnson's determination of probable cause.

The Ninth Circuit has held that, following a <u>Terry</u> stop, a search of the driver resulting in the discovery of two vials commonly used to store drugs along with white residue in one, provides probable cause to search the vehicle driven. <u>United States v. Barnett</u>, 414 Fed.Appx 17 (2011). Here, an officer could draw a reasonable inference, based on the presence of drugs on the knife and the fleeing passenger, that there is a fair probability that the car contained drugs. Moreover, there may appears be probable cause to search the vehicle for evidence of its theft or some other burglary given the removed window and plain view of the ski mask/hat and gloves.[10]

---

[10]Throughout oral argument, defense counsel provided innocent explanations for many of the observations, with the exception of Fry's dilated pupils and track mark. Counsel also argued that it is illogical for the removal of a window to signal a theft because, he believes, the car would have to be either unlocked to position the window for removal or the window would have to be sufficiently rolled down such that the thief could simply unlock the door. It is not hard to imagine that an experienced burglar may have tools, such as suction cups, to facilitate the removal of window from a locked vehicle. Moreover, possible innocent explanations do not negate the officer's conclusions so long as those conclusions are reasonable based on the officer's experience.

CONCLUSION

For the reasons stated above, defendant's motion to suppress (#23) is denied.

DATED this _____ day of ~~February~~ *March*, 2013.

_____
Ann Aiken
United States District Judge

17 - ORDER